MHN

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) <br> ) <br> v. ) <br> ) <br> SHANNON BENNETT, aka "Shine" ) <br> ) | Case No. 08 CR 1028-8 <br><br> Judge Joan B. Gottschall |

## MEMORANDUM OPINION AND ORDER

Defendant Shannon Bennett, aka "Shine," was indicted for his alleged participation in a conspiracy to distribute cocaine. (Indictment, Doc. No. 110.) This matter comes before the court on Bennett's motion to suppress evidence obtained as a result of his arrest. (Mot. to Quash Arrest and Suppress Evid., Doc. No.187.)

### I. BACKGROUND

**A. Atkins' Cocaine Business**

According to the Government, Robert Atkins was the leader of a drug trafficking organization responsible for distributing cocaine to mid-level dealers throughout Chicago's west and northwest suburbs. (Resp. at 2-4, Doc. No. 227 (citing Kays Aff. ¶ 5, Ex. A).) Bennett was allegedly one of those mid-level dealers. (Kays Aff. ¶ 7.) Evidence obtained by the FBI and local law enforcement indicates that on at least six occasions in June and July of 2007, Atkins met with various individuals in the parking lot of Woodfield Mall in Schaumburg, Illinois to distribute narcotics. (Resp. at 3-4 (citing Kays Aff. ¶¶ 75-79, 89-95, 96-98, 105-107, 108-113, 119-121).)

**B   Bennett's Previous Narcotics Transaction with Atkins**

Agents intercepted phone calls indicating that Atkins and Bennett had a "pre-existing narcotics relationship." (*Id.* at 4 (citing Kays Aff. ¶¶ 83-85).) On June 27, 2007, the following conversation took place between Atkins and his associate, Robert Wasp:

| | |
|---|---|
| Atkins: | Hey man, I need you to uhh ... pick somethin' up for me man. |
| Wasp: | What? How much? |
| Atkins: | Two ... two of 'em. |
| Wasp: | Shit, what you want me to come grab it or something'? You gonna be bringin' it over here? What you wanna do? How you wanna do it? |
| Atkins: | Shit ... I just thought about it. I left and shit, uh. Cause I wanna take it up to the Shine crib. |
| Wasp: | Ok, I'll do it. |

(Call No. 3079, Ex. B to Resp.) Agents interpreted this call to mean that Atkins and Wasp were discussing "the delivery of a quantity of cocaine to [Bennett]." (Resp. at 4 (citing Kays Aff. ¶ 84).)

On June 28, 2007, the Government intercepted a call in which Atkins discussed his meeting with Bennett the day before:

| | |
|---|---|
| Wasp: | Hello? |
| Atkins: | What up? |
| Wasp: | I was just seein' how that was yesterday. |
| Atkins: | It was cool. I don't know, it worked for Shine, (UI)[1]. It worked for Shine, man. |
| Wasp: | Oh, ok, I was just seein' ... seein' if they cool. |
| Atkins: | Oh yeah, he liked it like a motherfucker. |

(Call 3223, Ex. B. to Resp.) Agents interpreted this conversation to mean that Bennett was satisfied with the cocaine he purchased. (Resp. at 4 (citing Kays Aff. ¶ 85).)

---

[1]   "(UI)" stands for "unintelligible."

## C. Atkins' Apparent Purchase of Cocaine From Avila

At the time of Bennett's arrest, the Government believed that Atkins had obtained cocaine from Yecenia Avila prior to Atkins' meeting with Bennett. (*Id.* at 4-8 (citing Kays Aff. ¶¶ 126-30).) On July 19, 2007, Avila made several calls to Atkins, urging Atkins to speak with "dude" because "they gotta know ... they wanted to know before um, by one o'clock ... like one o'clock, 1:30 because they gotta talk to the people and see what's up, like, you know." (*Id.* (citing Calls 7109, 7213, 7215, Ex. B).) An unknown individual identified only as "Omar" (presumably the "dude" Avila was referring to in his previous call) called Atkins that afternoon, and the following conversation ensued:

| | |
|---|---|
| Omar: | Oh well, here's I just wanna know one thing, ah we got some right now, right. I just wanted to talk to you in detail. |
| Atkins: | Okay. |
| Omar: | You want 'em now? |
| Atkins: | Yeah. |
| Omar: | Cause it has to be done, it has to be done at one o'clock, you know, and dude's, you know, he's kind of pissed off right now. Cause I was gonna call him back at one. (UI) I'm sayin'? |
| Atkins: | Mmmmhm. |
| Omar: | So . . . |
| Atkins: | I thought we already knew what we was gonna do. |
| Omar: | Yeah, yeah, yeah, yeah. Well, I just wanted you know, tell you, you know, give me how many? |
| Atkins: | Ah, but you know I wanted to talk about that ah, number and shit. Still the same? |
| Omar: | Yeah ... same ... well, you know, you said two one, right? |
| Atkins: | Yeah, but shit, motherfuckers be gettin' that shit a little cheaper now. |
| Omar: | No way! |
| Atkins: | Yeah, I mean, you know what I'm sayin', I was (UI) do what I can with that shit, with what you all got, cause I ain't gonna take that many. |
| Omar: | Okay, okay, you gonna be here? |
| Atkins: | Yeah, let me come over there, man. |
| Omar: | Yeah man, please. |
| Atkins: | Alright. I'll be right there, I'm on my way right now. |
| Omar: | Alright. |

3

(Call 7236, Ex. B to Resp.) Agents believed that Avila was brokering a drug transaction between Atkins and Omar, which the parties planned to consummate that evening. (Resp. at 4-7 (citing Kays Aff. ¶ 130).)

An hour after the call between Atkins and Omar, agents watched Atkins drive to a residence associated with Avila. (*Id.* (citing Kays Aff. ¶ 130).) Upon arriving, Atkins parked his car and entered the residence. (*Id.* (citing Kays Aff. ¶ 130).) Avila and an unknown female then exited the residence and drove Atkins' car around the corner, where they parked it. (*Id.* (citing Kays Aff. ¶ 130).) Fifteen minutes later, Atkins left the house carrying a "leather satchel" and walked back to his car. (*Id.* (citing Kays Aff. ¶ 130).) Agents believed that the leather satchel contained drugs, meaning that "Atkins would have had cocaine to sell to [Bennett] the next day." (*Id.* at 13.)

The agents' suspicions were bolstered by a call they intercepted the following morning:

> Avila: Okay ... ummm ... you ready?
> Atkins: Yeah, I'm not done working out.
> Avila: Oh, and when is that?
> Atkins: About 30, 40 minutes?
> Avila: To be exact, two hours.
> Atkins: Yeah. Why what's up, they ready?
> Avila: Yeah.
> Atkins: Alright.

(Call 7334, Ex. B to Resp.) Agents believed that Atkins and Avila were discussing payment for the drugs that Avila was thought to have purchased the night before. (Resp. at 4-7 (citing Kays Aff. ¶ 130).)

As it turns out, agents were wrong about Atkins' meeting with Avila. (*See id.* at 7 n.3.) In its response brief, the Government admits that "[f]ollowing the December 2008

4

arrest of the defendants in this case, the government obtained additional information indicating that Atkins did not obtain narcotics from Avila or Omar . . . on July 19 or 20, as the government believed . . . ." (*Id.*)

D. **Bennett and Atkins' Meeting at Woodfield Mall**

On July 20, 2007, the Government intercepted a number of calls in which Bennett attempted to, and eventually did, coordinate a meeting with Atkins. (*Id.* at 8-9 (citing Kays Aff. ¶¶ 137-40).) An unknown male called Atkins at 12:17 p.m., to discuss the following:

| | |
|---|---|
| UM[2]: | Shit, you cool? |
| Atkins: | Yeah, I'm good. |
| UM: | Hit Shine, he's lookin' for you. |
| Atkins: | Alright. |

(Call 7331, Ex. B to Resp.) Atkins called Bennett almost immediately, and the following conversation ensued:

| | |
|---|---|
| Bennett: | What's wrong with your phone? |
| Atkins: | I don't know. What's happening, what you mean? |
| Bennett: | I, I had called you. |
| Atkins: | Oh, you did? What happened? |
| Bennett: | (UI) straight to voicemail. |
| Atkins: | I don't even know. |
| Bennett: | Sound like, sound like a drunk ass old man! |
| Atkins: | (Laughs) Hey, but dude ain't even called me yet. |
| Bennett: | Oh? |
| Atkins: | You can still make your way if you want to, but he ain't called me yet. Or you can wait till I call you. |
| Bennett: | I need to get, get that before traffic gets bad, before I lose my ride with this bitch here. Shit ... I'm just gonna go and eat out there anyway. |
| Atkins: | Alright, well come on. |
| Bennett: | Alright. |

---

[2] "UM" stands for "unknown male."

5

(Call 7333, Ex. B to Resp.) The Government interpreted these calls to mean that Bennett was planning to purchase narcotics from Atkins, and that he hoped to complete the transaction before rush hour. (Resp. at 8-9, 13-15.)

Two hours later, Bennett called Atkins to check on the status of their meeting. (Calls 7339, 7343, Ex. B to Resp.) Bennett's first call went straight to voicemail, but he eventually reached Atkins:

| Bennett: | I'm in the mall. |
| Atkins: | Alright. |
| Bennett: | Alright. |
| Atkins: | Give me, ah, give me about 30 minutes, man. |
| Bennett: | Alright. |

(Calls 7339, 7343, Ex. B to Resp.)

After waiting an additional three hours with no word from Atkins, Bennett called Atkins again. (Call 7368, Ex. B to Resp.) Bennett's first call went to voicemail (*id.*), but he successfully reached Atkins a few minutes later (Call 7370, Ex. B to Resp.). The following conversation ensued:

| Bennett: | Hello? |
| Atkins: | What's up fool? |
| Bennett: | Was you makin' love or something? |
| Atkins: | Nah, man, I'll be there in like, five minutes, man. |
| Bennett: | Alright, I'm still in the mall. |

(*Id.*) A few minutes later, Wasp called Atkins on Bennett's behalf:

| Wasp: | Shit, how long you gonna take to be ready? |
| Atkins: | Huh? |
| Wasp: | I said how long you gonna take to be ready? |
| Atkins: | Oh shit, ah, probably about an hour. |
| Wasp: | Okay, you know, Shine waitin' up at Woodfield. |
| Atkins: | Yeah, I know. |

(Call 7372, Ex. B to Resp.)

6

Agents witnessed Atkins enter Woodfield Mall at approximately 5:30 p.m. (Kays Aff. ¶ 139; *see* Mot. ¶ 4.) Shortly thereafter, Agents observed Atkins and Bennett standing together outside a shoe store in the mall. (Kays Aff. ¶ 139; *see* Mot. ¶ 4.) At approximately 5:45 p.m., Atkins and Bennett walked to the mall parking lot, where they entered Atkins' car. (Kays Aff. ¶ 139; *see* Mot. ¶ 4.) Atkins then drove a short distance through the parking lot; five minutes later Bennett emerged from Atkins' car and walked to Bennett's own automobile, which was parked nearby. (Kays Aff. ¶ 139; *see* Mot. ¶ 4.) At approximately 5:50 p.m., Atkins and Bennett left the parking lot in their respective vehicles. (Kays Aff. ¶ 140; see Mot. ¶ 4.)

Agents did not witness any hand-to-hand exchange between Atkins and Bennett, nor did agents see Bennett carrying any sort of package when he left Atkins' car. (Mot. ¶¶ 9-10; *see* Kays Aff. ¶ 139.) Nonetheless, agents believed that "Atkins and [Bennett] easily could have engaged in a hand-to-hand transaction out of law enforcement's line of sight." (Resp. at 14.)

### E. Atkins' Attempt to Schedule a Narcotics Transaction With Hamlette

Based on another set of intercepted phone calls, agents believed that "Atkins planned to conduct another cocaine transaction with . . . [Randy] Hamlette at Woodfield Mall" after Atkins' meeting with Bennett. (*Id.* at 9.) On July 20, 2007 at 2:24 pm., Hamlette called Atkins to ask if he was "good," to which Atkins replied "Yeah, little something.'" (Call 7349, Ex. B to Resp.) Hamlette explained that he needed Atkins' help "for a squeeze play," that he was "trying to get out this hole I'm in." Atkins refused, saying that "All the motherfuckin' loss is on the dealers . . . . I can't take no more losses, that's how I lost last time." (*Id.*) Hamlette asked Atkins to "front me at least a 7 so that

7

way, you know, I'm spending four, you gonna give me like 21 for the four, and I pay you back in two days?" (*Id.*) When Atkins balked, Hamlette promised that "You'll be straight in two days, son." (*Id.*) Hamlette explained that he was short on money because one of his associates "split it up, he bagged it up, he split it up and down the middle and I gave it to one of my guys and he bumped it for me, know what I mean, so I only got like 400 right now." (*Id.*) Atkins eventually agreed to give Hamlette "the whole heazy" for his "four." (*Id.*) Agents interpreted this conversation to mean that Hamlette was asking Atkins to sell him cocaine on consignment, and that Atkins refused but offered to sell Hamlette a half an ounce of cocaine for $400. (Resp. at 9-11 (citing Kays Aff. ¶ 125).)

After Atkins concluded his meeting with Bennett (but prior to Bennett's arrest), Atkins received a call from Hamlette. (Call 7378, Ex. B to Resp.) Hamlette asked Atkins to meet him in Palatine, but Atkins declined to because it was too far away. (*Id.*) After discussing the matter, Atkins and Hamlette agreed to meet "[o]ver by Woodfield, over in that area." (Call 7379, Ex. to Resp.) A few phone calls later, Atkins and Hamlette decided on a more precise location, and ultimately convened outside a nail salon in the mall. (Calls 7384, 7389, Ex. B to Resp.) Agents interpreted these calls as "further evidence that Atkins had cocaine to sell, to both defendant and Hamlette."[3] (Resp. at 14.)

## F. Bennett's Arrest and Indictment

Agents continued their surveillance of Bennett as he drove away from Woodfield Mall towards Chicago. (Kayes Aff. ¶ 140; Mot. ¶ 4.) After trailing him for approximately seventy-five minutes, City of Chicago police officers stopped Bennett's

---

[3] Information obtained by the Government subsequent to Bennett's arrest indicates that Atkins did not distribute narcotics to Hamlette on the evening of July 20. (Resp. at 11 n.6.) What transpired during Hamlette and Atkins' meeting is unknown. (*See id.*)

8

car. (Kayes Aff. ¶ 140; Mot. ¶ 2.) The officers searched Bennett, and discovered a plastic bag containing 122.5 grams of cocaine tucked inside Bennett's waistband. (Kayes Aff. ¶ 140; Mot. ¶ 4.) Bennett was subsequently indicted for possession of cocaine with intent to distribute, along with co-defendants Atkins, Wasp, Avila, Hamlette, and others. (Indictment.) Bennett now moves to suppress all evidence obtained as a result of his arrest, on the grounds that the officers lacked probable cause to arrest him under the Fourth Amendment. (Mot.)

## II. ANALYSIS

### A. Evidentiary Hearing

The Government argues that no evidentiary hearing is necessary on Bennett's motion to suppress because "defendant does not dispute the facts that preceded his stop." (Resp. at 16-17.) It is unclear whether Bennett seeks an evidentiary hearing or not. (*See* Mot.; Reply, Doc. No. 230; Supp. to Mot., Doc. No. 254.) Bennett failed to request an evidentiary hearing in his motion to suppress, nor did Bennett make any reference to an evidentiary hearing in his reply brief. (*See* Mot.; Reply.) In a supplemental filing, Bennett stated that he does not dispute the "existence" of the "audio tape evidence, video tape evidence," but claimed that such evidence is "open to interpretation." (Supp. to Mot.) Bennett advised the court that he "in no way concedes" any other evidence the Government may seek to use. (*Id.*) The court finds that no evidentiary hearing is necessary to resolve Bennett's motion.

In deciding a motion to suppress, "[e]videntiary hearings are not required as a matter of course," and need only be conducted "[w]hen the allegations and moving papers are sufficiently definite, specific, non-conjectural and detailed enough to conclude

9

that a substantial claim is presented and that there are disputed issues of material fact which will affect the outcome of the motion. *United States v. McGaughy*, 485 F.3d 965, 969 (7th Cir. 2007) (quoting *United States v. Villegas*, 388 F.3d 317, 324 (7th Cir. 2004)). Accordingly, "[r]eliance on vague, conclusory allegations is insufficient" to obtain an evidentiary hearing. *United States v. Randall*, 966 F.2d 1209, 1212 (7th Cir. 1992).

Nowhere in his motion or accompanying memoranda does Bennett identify any "disputed issue of material fact" that might justify an evidentiary hearing. (*See* Mot.; Reply; Supp. to Mot.) Bennett does not contest the Government's assertion that Atkins was a drug dealer who conducted business at Woodfield Mall, nor does Bennett dispute that he had previously purchased narcotics from Atkins. (*See* Mot.; Reply.) Regarding the agents' belief that Atkins obtained cocaine from Avila, Bennett admits that "Atkins could have had drugs to sell to Bennett [from his meeting with Avila], and that may have been the reason Bennett met with Atkins." (Reply at 2.) Moreover, Bennett and the Government's respective descriptions of the facts and circumstances surrounding the July 20 meeting with Atkins are substantially the same. (*Compare* Mot. ¶¶ 3-4 *with* Resp. at 8-9.) Bennett also fails to dispute that Atkins "reached out" to Hamlette for a second drug deal on July 20. (*See* Mot.; Reply.) Although Bennett argues that the evidence adduced by the Government is "open to interpretation," Bennett does not offer any interpretations of his own, or explain why the Government's interpretation of that evidence is incorrect. (*See* Supp.) Since Bennett fails to identify any disputed issues of material fact with respect to the Government's evidence, the existence of probable cause can be determined by the court as a matter of law. *See United States v. Walker*, 237 F.3d

10

845, 850-51 (7th Cir. 2001) (holding that no evidentiary hearing was warranted where parties agreed on facts but disagreed as to whether such facts gave rise to probable cause); *United States v. Kunda*, No. 01 CR 118, 2001 WL 1543519, at *4 (N.D. Ill. Dec. 3, 2001) (same). Accordingly, Bennett's request for an evidentiary hearing (to the extent he requests one) is denied.

B.  **Probable Cause**

The Government argues that agents had probable cause to arrest Bennett "given the totality of the circumstances." (Resp. at 2.) In support of its argument, the Government points to Atkins' involvement in drug trafficking, the prior drug transaction between Atkins and Bennett, Bennett's wiretapped telephone conversations with Atkins, the "suspicious circumstances of Atkins' meeting with Bennett," and Atkins' subsequent attempted drug deal with Hamlette. (*Id.*) Bennett urges that "[t]he facts and circumstances within the knowledge of law enforcement agents at the time of Bennett's arrest did not come close to amounting to probable cause." (Mot. ¶¶ 11.) The court finds that the Government has adequately demonstrated probable cause.

"The Fourth Amendment prohibits unreasonable searches or seizures, and courts exclude evidence obtained through an unreasonable search or seizure." *United States v. Burnside*, 588 F.3d 511, 517-18 (7th Cir. 2009) (quoting *United States v. Mosby*, 541 F.3d 764, 767 (7th Cir. 2008)). Police may, however, arrest an individual if they have "probable cause to believe that the individual engaged in criminal conduct," and "an arrest supported by probable cause is reasonable by its very nature." *Id.* Likewise, "there will be no Fourth Amendment violation in a search incident to arrest where the arresting

11

officer . . . has probable cause to make such arrest." *United States v. Kincaid*, 212 F.3d 1025, 1028 (7th Cir. 2000).

In order for probable cause to exist, "law enforcement agents must reasonably believe, in light of the facts and circumstances within their knowledge at the time of the arrest, that the suspect had committed or was committing an offense," *United States v. Biggs*, 491 F.3d 616, 620 (7th Cir. 2007) (quoting *Payne v. Pauley*, 337 F.3d 767, 776 (7th Cir. 2003)). Probable cause "is a fluid concept that relies on the common-sense judgment of the officers based on the totality of the circumstances." *United States v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006). "In determining whether suspicious circumstances rise to the level of probable cause, officers are entitled to draw reasonable inferences based on their training and experience." *Id.* "Determinations of probable cause are naturally based on probabilities, and a finding of probable cause 'does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime.'" *United States v. Funches*, 327 F.3d 582, 586 (7th Cir. 2003) (quoting *United States v. Carrillo*, 269 F.3d 761, 766 (7th Cir. 2001)). "Probable cause requires only a substantial chance of criminal activity, not an actual showing of such activity." *United States v. Schaafsma*, 318 F.3d 718, 722 (7th Cir. 2003).

"In a motion to suppress evidence seized pursuant to an alleged violation of the Fourth Amendment, the allocation of the burden of proof depends upon whether or not a warrant was issued." *United States v. Rosario*, No. 94 CR 261-1, 1996 WL 535345, at *4 (N.D. Ill. Sept. 19, 1996). "[I]f the search or seizure was effected pursuant to a warrant, the defendant bears the burden of proving its illegality; if the police acted without a

warrant, the prosecution bears the burden of establishing legality." *Id.* (quoting *United States v. Longmire*, 761 F.2d 411, 417 (7th Cir. 1985)). Since no warrant had been issued at the time of Bennett's arrest, the Government has the burden of demonstrating probable cause in the case *sub judice*. (*See* Mot. ¶¶ 2-4; Kayes Aff. ¶ 140.)

The facts and circumstances known to agents at the time of Bennett's arrest show that there was a "substantial probability" that Bennett was involved in criminal activity. *See Biggs*, 491 F.3d at 620. Turning first to the events preceding Atkins and Bennett's July 20 meeting, it is undisputed that Atkins was a "multi-kilogram drug dealer" who conducted business at Woodfield Mall. (Kays Aff. ¶ 5.) The fact that Bennett planned to meet Atkins in the very place where Atkins was known to distribute cocaine gave agents reason to be suspicious. Moreover, agents intercepted telephone calls between Atkins and Wasp indicating that Bennett had purchased cocaine from Atkins in June of 2007. (*Id.* ¶¶ 83-85.) Since Bennett had previously obtained drugs from Atkins, agents were justified in believing that any subsequent meeting between Bennett and Atkins might also be a narcotics transaction. Further, the agents' well-founded belief that Atkins obtained cocaine from Avila the night before his meeting with Bennett meant that "Atkins could have had drugs to sell to Bennett, and that may have been the reason Bennett met with Atkins."[4] (Reply at 2.)

The events of July 20 gave agents even more reason to believe that Bennett and Atkins were engaged in a drug deal. Agents intercepted a call in which Bennett told

---

[4] Although the Government later learned that Avila did not provide Atkins with any cocaine on the evening of July 19 (Resp. at 7 n.3), Bennett does not dispute that agents were reasonable in making this inference (*see* Mot.; Reply). "A court evaluates probable cause not with the benefit of hindsight, and not on the facts as perceived by an omniscient observer, but on the facts as they appeared to a reasonable person in the [officer's] position, even if that reasonable belief turned out to be incorrect." *Stokes v. Bd. of Educ. of the City of Chic.*, 599 F.3d 617, 622 (7th Cir. 2010). Thus, the Government's mistaken belief does not militate against a finding of probable cause.

13

Atkins that he needed "to get, get that before traffic gets bad." (Call 7333.) In light of Bennett and Atkins' previous narcotics transaction and Atkins' history of distributing drugs at Woodfield, agents were justified in interpreting the call to mean that Bennett wanted to purchase cocaine before rush hour. (Resp. at 8-9, 13-15.) The manner in which Atkins and Bennett conducted their meeting also gave agents cause for suspicion. Bennett waited more than three hours at the mall for Atkins to show up, calling several times to check on Atkins' progress. (*See, e.g.*, Calls 7331, 7333, 7339, 7343, 7368, 7370, 7372.) The time and effort Bennett invested in setting up the meeting suggests that the meeting was important, and that it involved business which could only be transacted in person, such as a hand-to-hand narcotics transfer. *See United States v. Black*, 73 Fed. Appx. 884, 887 (7th Cir. 2003) (holding that probable cause supported in part by defendant's "unsolicited calls [to a known drug dealer] demanding to know where he was and why he was delayed."). The fact that Wasp called Atkins on Bennett's behalf provides additional justification for the agents' suspicions, since Wasp helped coordinate the cocaine deal between Atkins and Bennett in June 2007. (*See* Calls 3079, 3223.) Once Atkins finally arrived at the mall, Bennett spent no more than twenty minutes with him, meeting briefly outside a shoe store and then adjourning to the parking lot, where Bennett and Atkins spent a few moments in Atkins' automobile before going their separate ways. (*See* Kays Aff. ¶ 139; Mot. ¶ 4.) Courts have recognized that meetings conducted in such a manner are "consistent with drug trafficking." *Burnside*, 588 F.3d at 518; *see also United States v. Parra*, 402 F.3d 752, 765 (7th Cir. 2005) (upholding determination of probable cause where known drug confederates drove to pre-arranged meeting in parking lot, spoke for a few moments inside automobile, then drove off);

14

*Funches*, 327 F.3d at 586 (same). Moreover, Atkins' attempt to schedule another drug deal with Hamlette indicates that Atkins had cocaine with him, thus lending credence to the agents' theory that Atkins was at the mall to deal drugs. (Calls 7349, 7378, 7379.) Taken together, these facts and circumstances support the agents' conclusion that Bennett and Atkins were engaged in a narcotics transaction. *See United States v. Colon*, 549 F.3d 565, 567 (7th Cir. 2008) (holding that agents had probable cause to arrest where defendant was heard arranging narcotics transaction on a wiretap and met with known drug dealer at dealer's usual place of business at appointed time); *United States v. Ochoa*, 301 Fed. Appx. 532, 353 (7th Cir. 2007) (same).

Bennett makes three arguments in support of his motion to suppress, all of which fail. First, Bennett argues that the agents lacked probable cause to arrest him because "[t]here are literally thousands of reasons why Atkins and Bennett could have met that day, and the large majority of those are wholly innocuous." (Reply at 3-4.) Though this may be true, it is unavailing to Bennett. "Even if there is an innocent explanation, as long as there is a reasonable probability that there is criminal activity afoot, despite the presence of other probabilities, probable cause is present." *United States v. Myrick*, No. 97 CR 197, 1997 WL 564673, at *12 (N.D. Ill. Sept. 3, 1997) (quoting *United States v. Dorfman*, 542 F. Supp. 345, 359 (N.D. Ill.1982)). The possibility that Bennett may have been planning to meet Atkins for shopping or a meal does not therefore vitiate the possibility that Bennett and Atkins were meeting for a drug deal. *See id.* Taken together, Bennett's actions "are difficult to explain as an innocent exchange, but quite easily understood, especially when observed by experienced narcotics officers, as a common method of conducting a drug deal." *Funches*, 327 F.3d at 586.

Second, Bennett argues that the agents lacked probable cause because none of the intercepted discussions between Atkins and Bennett mentioned narcotics "by name or code word." (*See* Mot. ¶¶ 7-10.) Bennett's argument is misplaced. As set forth above, agents had good cause under the circumstances to believe that Bennett's conversation with Atkins, in which he expressed a desire "to get, get that before traffic gets bad," referred to cocaine. (*See* Call 7333.) What is more, Bennett and Atkins' conversations are made more suspicious, not less, by their seemingly purposeful vagueness. (*See* Calls 7331, 7333, 7339, 7343, 7368, 7370, 7372.) If Atkins and Bennett had some innocent reason for their meeting, why not openly discuss it? "[S]uch veiled language is inconsistent with an innocent transaction." *United States v. Murray*, No. 05 CR 650, 2007 WL 79249, at *5 (N.D. Ill. Jan. 5, 2007).

Third, Bennett argues that there was no probable cause because agents did not witness any hand-to-hand drug transfers between Atkins and Bennett. (*See* Mot. ¶¶ 7-10.) "Although the agents did not . . . observe [defendants] handling any substances believed to be narcotics, we believe that the totality of the suspicious circumstances at the time of the arrest justified a finding of probable cause." *Carrillo*, 269 F.3d at 766. In *United States v. Burnside*, 588 F.3d at 518, the defendant argued that there was no probable cause for his arrest because "officers did not have a clear vantage point from which to witness the alleged drug transaction." In light of the defendant's history of drug dealing and the circumstances of the meeting (which took place in a car parked in a public lot), the *Burnside* court found that "[t]he officers, employing even a modicum of common sense, had probable cause to conclude that something illegal occurred." *Id.* The same is true in the instant action; considering Atkins and Bennett's previous narcotics

16

transaction and the suspicious circumstances of their meeting, agents were justified in surmising that a drug deal had taken place in Atkins' car.

In sum, the facts and circumstances known to agents at the time of Bennett's arrest are sufficient to support a determination of probable cause. Accordingly, Bennett's motion to exclude evidence obtained as a result of his arrest is denied.

### III. CONCLUSION

For the foregoing reasons, Bennett's motion to quash and suppress [Doc. No. 187] is denied.

ENTER:

JOAN B. GOTTSCHALL
United States District Judge

DATED: July 15, 2010